**NATIONAL PAINT & COATINGS ASSOCIATION; Rust–Oleum Corporation, an Illinois corporation; the Sherwin–Williams Company, an Ohio corporation; Ace Hardware Corporation, a Delaware corporation; Tru–Test Manufacturing Company, a Delaware corporation; FMA Inc., d/b/a Jim's Ace Hardware, an Illinois corporation; W.C. Schauer Hardware Center, Inc., an Illinois corporation; Smiley Ace Hardware, Inc., an Illinois corporation, Plaintiffs,**

v.

**CITY OF CHICAGO, an Illinois municipal corporation, Defendant.**

**No. 92 C 4023.**

United States District Court, N.D. Illinois, E.D.

Sept. 29, 1993.

Steven P. Handler, Harvey M. Sheldon, Bruce H. Weitzman, Paul Andre Katz, Edward C. Stewart, Victoria Lynn Petrow, McDermott, Will & Emery, P.C., Chicago, IL, for plaintiffs except Sherwin–Williams Co.

Thomas G. Dent, Jeryl L. Olson, Peter C. Woodford, Therese G. Pinter, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Sherwin–Williams Co.

Susan R. Lichtenstein, Anita K. Modak–Truran, Ronald D. Jolly, Nancie M. Campbell, Gail A. Niemann, City of Chicago, Law Dept., Corp. Counsel, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

In response to the growing problem of graffiti in Chicago, on May 20, 1992, the City Counsel of the City of Chicago enacted four ordinances, Municipal Code §§ 4–132–150, 8–4–130, 8–16–095 and 8–16–096, regulating the sale and possession of paint in spray cans ("spray paint") and markers containing a non-water soluble fluid and having a writing surface of ⅜ of an inch or greater ("large markers"). Plaintiffs,[1] seeking declaratory and injunctive relief, challenge the constitutionality of §§ 4–132–150 and 8–4–130(a).[2]

In a memorandum opinion and order dated July 31, 1992, we narrowed plaintiffs' challenge to the following issues: (1) whether §§ 4–132–150 and 8–4–130(a) impose an impermissible burden on interstate commerce; (2) whether §§ 4–132–150 and 8–4–130(a) violate plaintiffs' right to substantive due process as guaranteed under the United States Constitution; and (3) whether §§ 4–132–150 and 8–4–130(a) constitute an illegitimate exercise of the police power afforded the City

---

1. Initially, plaintiffs consisted of the following manufacturers, transporters, retail sellers and consumers of spray paint and large markers: (1) National Paint Coatings Association; (2) Rust–Oleum Corporation; (3) The Sherwin–Williams Company; (4) Ace Hardware Corporation; (5) Tru–Test Manufacturing Company; (6) FMA Inc., d/b/a/ Jim's Ace Hardware; (7) W.C. Schauer Hardware Center, Inc.; (8) Elston Ace Hardware, Inc.; (9) Smiley Ace Hardware, Inc.; (10) The Art & Craft Materials Institute; (11) Brudno Art Supply Store Co.; (12) Sakura Color Products of America; (13) Peter Michael O'Brien; and (14) Kirby J. Briske. On March 19, 1993, we afforded plaintiffs Elston Ace Hardware, The Art & Craft Materials Institute, Brudno Art Supply Store Co., Sakura Color Products of America, Peter Michael O'Brien and Kirby J. Briske voluntary dismissal without prejudice. For the sake of convenience, we will refer collectively to the remaining eight entities as "plaintiffs."

2. Although § 8–4–130 consists of two subsections, plaintiffs do not challenge the constitutionality of § 8–4–130(b), which prohibits the possession of spray paint and large markers "on the public way with the intent to use the same to deface any building, structure or property." *See* Complaint ¶ 3, at 3. Likewise, plaintiffs do not challenge the validity of § 8–16–095, which prohibits minors from possessing spray paint and large markers, nor do they challenge § 8–16–096, which prohibits aiding and abetting minors in obtaining possession of such items. *Id.*

of Chicago under the Illinois Constitution. *National Paint & Coatings Ass'n v. City of Chicago,* 803 F.Supp. 135, 149 (N.D.Ill.1992). In conjunction with the above listed issues, the court conducted a bench trial, which began on July 15, 1993 and, after six days of testimony, concluded on August 2, 1993. After a careful review of the evidence presented at trial, both oral and written, the various trial exhibits, all relevant pleadings and memoranda of law, we issue the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. *The Challenged Ordinances*

1. Section 4–132–150 of the Municipal Code, as amended on May 20, 1992, prohibits the retail sale of spray paint and large markers in the City of Chicago. That provision provides:

> It shall be unlawful for any person holding a retail business license to sell paint in spray cans to any person or to sell any marker containing a fluid which is not water soluble and has a point, brush, applicator or other writing surface of three-eights of an inch or greater to any person.

Municipal Code of Chicago, § 4–132–150. "Any person found in violation of Section 4–132–150 shall be fined not less than nor more than $100.00 and/or required to perform reasonable public service for each separate offense." *Id.* § 4–132–170.

2. Section 8–4–130(a) prohibits the possession of spray paint and large markers in Chicago's public buildings, public facilities or on the property of another:

> (a) It shall be unlawful for any person to possess a spray paint container, liquid paint or any marker containing a fluid which is not water soluble and has a point, brush, applicator or other writing surface of three-eighths of an inch or greater, on the property of another or in any public building or upon any public facility. It shall be a defense to an action for violation of this subsection that the owner, manager or other person having control of the property, building or facility consented to the presence of the paint or marker.

Municipal Code of Chicago, § 8–4–130(a). Notably, if enforced as written, the ordinance will result in the arrest and prosecution of adults who possess spray paint, liquid paint or any large marker on the property of another, in any public building or upon any public facility regardless of the individual's intent to commit graffiti vandalism. Although some of these adults may eventually prevail under the defense provided for those with the consent of the owner, manager or other person controlling the property, such defense does not guarantee that these individuals will not be arrested and prosecuted in the first instance. The penalty for violating this provision is a fine not to exceed $200. *Id.* § 8–4–360.

### B. *Defining "Graffiti Vandalism"*

3. Although listed as a contested issue in this case, the parties have agreed upon the following broad definition of "graffiti vandalism": "marks placed on property without owner's consent." Final Pretrial Order, Exhibit L–1 ¶ 51 & Exhibit L–2 ¶ 51. Despite the City's acquiescence to plaintiffs' proffered definition, however, it is evident that such a definition is far too overinclusive to be helpful to the present inquiry. Consider, for instance, the following scenario. Upon completion of a stressful work day, a co-worker invites you to join her for dinner and, so as not to offend her, you accept. As your co-worker's apartment is only four blocks from the office, you decide to get a little exercise and walk. Unfortunately, on the way over it begins to rain and, being completely unprepared, you become wet and muddy. As you arrive at your co-worker's apartment, you are so eager to enter a warm and dry room that you forget to take off your shoes and, hence, leave a muddy footprint on your co-worker's new carpet without permission. Fairly, such an incident cannot even be labelled vandalism, yet under the above definition, the footprint left on the carpet would be considered "graffiti." To further the point, consider a tire mark left by a person who purposefully drives over another's lawn without permission. While certainly an act of vandalism, all parties can agree that such conduct is not "graffiti" as it concerns this case.

4. No single formulation of the term can adequately encompass the common notion held by the court and the respective parties of what constitutes "graffiti." Nonetheless, we believe that an accurate description must provide that "graffiti" is in fact intended as an expression of ideas, information and culture, as opposed to a product of carelessness and neglect. As important, who creates "graffiti" and how it is applied sheds considerable light on our efforts to initially identify "graffiti." In light of these considerations, which are discussed in detail below, and to aid in our present inquiry, we offer the following definition: "graffiti" refers to "an inscription, drawing or design scratched, painted, sprayed or placed without the consent of the owner on a surface so as to be seen by the public."

### C. *The Magnitude of the Graffiti Problem in Chicago*

5. At the outset, we note that plaintiffs do not dispute that graffiti is a serious problem. It is present on property in all 50 wards in Chicago. Final Pretrial Order, Exhibit A ¶¶ 6–7. Further, no type of property has been spared. Upon walking through the streets in Chicago, one can find graffiti on homes, garages, roof tops, mailboxes, libraries, churches and synagogues, public sculptures, park benches, buses, trains, tree trunks, sidewalks and virtually any other type of property present in the City. *See* Plaintiffs' Trial Exhibits 38–46, 85, 95; Defendant's Trial Exhibits 8, 19, 26, 70, 72, 74, 76, 79, 84, 86, 88. Indeed, according to one of plaintiffs' expert witnesses, Jay Beswick, over 5,000,000 square feet in Chicago is covered with graffiti. R445.

6. The costs associated with graffiti vandalism are substantial to both public and private sectors. The City, along with various public agencies, including the Chicago Transit Authority ("CTA"), the Chicago Board of Education, the Chicago Park District and the Chicago Housing Authority, has been forced to allocate scarce resources, to the tune of millions of dollars, in order to effect graffiti removal. *See* Defendant's Trial Exhibits 1, 10–15, 20, 72, 81–82, 88. Additionally, community groups have devoted significant time and energy to removing graffiti from private homes, garages, fences, roof tops, stores and other property. *See* Defendant's Trial Exhibits 25–26, 79, 84–85. Less quantifiable, but just as important as the cost of removal, are the long-term effects of graffiti on the various neighborhoods of Chicago. For instance, a tolerance for graffiti could result in physical deterioration and, thus, lower property values. R446–47 (testimony of Jay Beswick); R554–55, 565–66 (testimony of Professor Wesley Skogan); Defendant's Trial Exhibit 51. Some also contend that graffiti out-of-control demoralizes a community and makes it ripe for increased criminal activity.

7. The evidence introduced regarding the magnitude of the problem certainly renders the City's effort to combat graffiti laudable. We observe, however, that the magnitude of the problem is not the primary issue before this court. Rather, as we have previously held, the court's focus remains with the costs and benefits of the measures adopted to eliminate the graffiti problem. *National Paint & Coatings Ass'n*, 803 F.Supp. at 143–44, 146–47.

### D. *Expected Efficacy of the Challenged Ordinances*

#### (i) *Graffiti Perpetrators and Their Motivations*

8. In order to demonstrate that the means employed under the challenged ordinances will neither achieve nor move the City closer to achieving the stated local objectives of decreasing the incidents of graffiti in Chicago, plaintiffs have devoted a substantial portion of time presenting evidence regarding who creates graffiti and why. The rationale is apparent, as a comprehensive understanding as to the motivations driving the perpetrators informs the issue of whether the measures in question will serve to deter such conduct. *See* R649–50 (testimony of Dr. Charles J. Cicchetti). In this case, the answer to who creates graffiti and why leads to the conclusion that the challenged ordinances will sadly have no deterrent effect whatsoever.

9. Graffiti vandalism in Chicago is caused by three distinct groups: taggers, gang members and miscellaneous groups. The miscellaneous groups sporadically deface

property with ethnic slurs or general messages such as "John loves Mary." R451–52 (testimony of Jay Beswick); Defendant's Trial Exhibit 88, ¶ 16 (affidavit of James Harney). Of the total graffiti in Chicago, these miscellaneous groups likely account for less than five percent, R268 (testimony of Devon Brewer); *see also* 451–52 (testimony of Jay Beswick), rendering their conduct a virtual nonissue in terms of efforts to combat graffiti. Of the remaining two groups, taggers commit the vast majority of the graffiti vandalism in Chicago, Final Pretrial Order Exhibit A ¶ 9, and virtually all of the graffiti on the CTA. Defendant's Trial Exhibits 70, 86.

10. Plaintiffs' expert witness respecting graffiti committed by taggers was Devon Brewer. In connection with his studies of taggers and the hip-hop culture with which they are affiliated, Brewer has developed personal relationships with and interviewed hundreds of taggers, or graffiti writers as they are often referred. R214, 294. According to Brewer, hip-hop graffiti began in the late 1960s in New York and Philadelphia, and gradually spread to other cities in the United States and across the world in the early to mid–1980s. R211. Brewer has studied the culture since 1987 in various cities, including Seattle, Vancouver, British Columbia, Portland, San Francisco, Los Angeles, Chicago, New York City, Amsterdam and Munich. R212–13.

11. There are three types of hip-hop graffiti: tags, throw-ups and pieces. R215. Tags are stylized signatures of a writer's chosen street name. R215; *see, e.g.,* Plaintiffs' Trial Exhibit 85A–B. Throw-ups are larger names written in bubble letters with an outline a different color than the interior of the letters. R218; *see, e.g.,* Plaintiffs' Trial Exhibit 85C–D. The most-elaborate type of hip-hop graffiti are pieces, which are elaborate, multi-colored murals. R219–25; *see, e.g.,* Plaintiffs' Trial Exhibit 85E–P.

12. The social organization in the hip-hop graffiti culture revolves around four confederations: classes, crews, networks and the mentor-protege relationships. R246. First, classes refer to the two loosely identifiable groups of hip-hop graffiti writers. Writers begin as taggers, concentrating on the writing of tags and throw-ups. R246–47. After paying their dues and developing skill, writers will move on to pieces, and those few writers who achieve significant fame become known as elite writers. R246. Second, crews are loose configurations of friends who write graffiti together. R247. Membership in one crew does not preclude membership in another and, unlike rival street gangs, there is no animosity between crews manifesting itself in physical confrontation. R247–48. Crews range in size from 2–12 members or more. R247. Within a crew, writers share materials and skills. R248. The third social organization in hip-hop graffiti culture is the social network between writers in different crews. R250. At the top echelon, writers are networked by telephone, written letter and personal visits. R250. At the center of this network is New York City, considered by graffiti writers as "the graffiti Mecca." R250. Finally, mentor relationships are an important part of hip-hop graffiti culture. They are mutually beneficial in that the mentor often imparts knowledge in exchange for materials. R250.

13. Hip-hop graffiti writers are overwhelmingly male. R228. They tend to be teenagers, ranging in age from 12–20, although some writers begin earlier and some continue through their 20s and even 30s. R228; *see also* Defendant's Trial Exhibit 70, ¶ 10 (affidavit of Constance Mortell) ("In general, the taggers I have met are males ranging in age from fourteen to twenty-two years old."). Those in their 20s and 30s, however, tend to be involved in larger and legal projects. R266–67. Writers come from all racial, ethnic and social backgrounds. R228; Final Pretrial Order, Exhibit A ¶ 8. They are highly mobile, "children of the transit system." R228, 232. Writers travel throughout the city and suburbs via automobile, public transportation and foot to obtain materials and write graffiti. R232–33, 261–62. For many, committing graffiti is the central focus of their lives and the most important aspect of their existence. R241. The commitment to graffiti writing is explained by the common values most writers share.

14. According to Brewer, hip-hop graffiti writers share two primary values, fame and artistic expression. R229. Brewer explained that achieving fame is a significant driving force for writers, as they compete with each other to obtain status among their peers. R229. Achieving fame necessitates a high degree of planning, energy and commitment; hip-hop graffiti is not random and spontaneous. R233. Three factors are important to achieving fame: (1) quality of work; (2) quantity of work; and (3) the risk involved in applying the graffiti. R230. Respecting quantity, geographic dispersion is an important aspect, prompting writers to travel not only throughout the City, but also to the suburbs. R230. To develop high quality, writers often practice in "piece books." R237–40; see e.g., Plaintiffs' Trial Exhibit 86. Writers also learn from other writers as well as from books, magazines and newsletters devoted to hip-hop graffiti. R235–37; see, e.g., Plaintiffs' Trial Exhibit 27. The risks associated with more valued graffiti include, for instance, that written on the "third rail" of the subway or the top of a freeway sign. R240–41. The second primary value, artistic expression, refers to the artistic value of the graffiti, an attributed even assigned to tags. R242.

15. Writers also share two secondary values, power and rebellion. R243. There are two aspects to power, the first being the sense of individual power a writer obtains by controlling various surfaces with his name. R243. The second aspect is the collective power that writers enjoy by being part of a movement or culture. R243. The final value is rebellion, i.e., the chance to disobey the conventional norms of our society. R244. Many writers thrive on the push-and-pull with authorities inherent in graffiti writing. R244–45.

16. Gang graffiti is the second major type of graffiti in Chicago and is distinct from hip-hop writing. Gangs use graffiti to mark territory and eulogize their dead. R185 (testimony of Dr. Diane Stone, a psychologist for the Chicago Board of Education); Plaintiffs' Trial Exhibit 96, at 3 (affidavit of Dr. Ray Hutchinson, an expert on Hispanic gangs in and around Chicago); see also Defendant's Trial Exhibit 83, ¶ 19 (affidavit of Officer Robert J. Simandl). Within gang culture, far from being a random or unplanned activity, "younger members are instructed on where and when to apply graffiti." R185–86; Plaintiffs' Trial Exhibit 96, at 9; see also Defendant's Trial Exhibit 83, ¶ 21 (In general, those still in elementary school commit gang graffiti.). Gang leaders oversee the placing of graffiti to ensure that unwanted attention is not brought upon the gang. R187. To be sure, according to Police Officer Don Lewis, graffiti is "playing lessor of a role" in gang culture in recent years as "the gang leaders, through the error of their past activities, have realized that it's no longer chic to be the stand out, to be overt." Plaintiffs' Trial Exhibit 156, at 85–86.

17. Although a variety of City witnesses stated, assumed or implied that graffiti is a spontaneous and random act, only three defense witnesses have had any significant contact with taggers or gang members in Chicago. Lt. Robert Angone and Constance Mortell have come in contact with a substantial number of taggers. Each of their testimony, however, corroborates that of plaintiffs' expert, Devon Brewer. For instance, although Angone stated in his affidavit that, "[a] tagger's degree of commitment to graffiti vandalism greatly varies.... [and that taggers] commit much of their tagging on impulse ... [and] for recreational benefits," Defendant's Trial Exhibit 86, ¶ 15, Angone has previously acknowledged that 90–95% of the graffiti affecting the CTA is committed by a group of individuals who spend most of their waking hours planning and writing graffiti:

Q. Can you tell me what is your opinion as to the motivation behind one who tags?

A. The motivation of a tagger is to vandalize, to graffiti vandalize as many surfaces as possible. It's a mind type of thing that it's just my vast experience from talking and dealing with hundreds and hundreds of them. They are some more to a degree more than others. There's 247s and then there's regular taggers that only go out after school or on weekends, but the number one objective is to get their tag name up in as many places as they can without getting caught.

Q. Is the purpose of that to gain recognition among their peers for the quantity?

A. The sole purpose of that is recognition not only among their peers, but everyone else who they think sees it. In some cases their peers don't have anything to do with it.

Q. And the more graffiti the higher their status?

A. Absolutely.

Q. You've mentioned in your previous answer the 247s.

A. 247 is exactly what he is, he's a 247, 24 hours a day 7 days a week. He's known in the trade as a 247.

Q. This is a full-time committed tagger?

A. That is a real tagger.

Q. What percentage of the CTA tagging graffiti would you attribute to the 247s?

A. I'd say that we're dealing with the CTA the transit authority problem, I'd say is being done by 90 percent of their taggers, 90 to 95 percent are done by 247s.

Q. 90 to?

A. 90 to 95 percent.

Q. I assume when someone spends 24 hours a day 7 days a week doesn't leave much for anything else. These people are focused almost entirely on this activity?

A. Entirely? As far as entirely by never washing, never eating, never sleeping, no.

Q. It's their life?

A. It's basically what they do at this particular time.

Plaintiffs' Trial Exhibit 157, at 112–14. Similarly, Constance Mortell testified that a small group of committed taggers, approximately 70 people organized into 14 crews, account for 75–80% of the graffiti on the CTA. Plaintiffs' Trial Exhibit 99, at 29. Respecting the motivations of gangs in committing graffiti, the City presented the written testimony of Chicago Police Officer Robert J. Simandl, who has served 16 years in the Department's Gang Crime Investigation Division and 4 years in the Youth Division. *See* Defendant's Trial Exhibit 83. His testimony is entirely consistent with that of Drs. Stone and Hutchinson as to who commits gang graffiti and why. *See id.* at ¶¶ 18–22.

18. Despite their accord as to the motivations of the two major perpetrators of graffiti in Chicago, naturally, the parties' experts rendered polar opinions as to the ultimate issue of deterrence. All three of plaintiffs' experts testified that neither of the challenged ordinances would reduce the level of graffiti in Chicago. R192–93 (testimony of Dr. Stone); R261–64 (testimony of Devon Brewer); Plaintiffs' Trial Exhibit 96 (Affidavit of Dr. Hutchinson); *see also* R399–401, 412–13, 462–63 (testimony of Jay Beswick). On the other hand, the three City witnesses who have had contact with taggers or gang members in Chicago testified that the ordinances would be valuable tools in combatting graffiti, likely shortening the span of time over which an individual commits graffiti, deterring new vandals from engaging in the crime, and reducing the number and extent of incidents of graffiti vandalism. Defendant's Trial Exhibits 70 (Mortell), 83 (Simandal), and 86 (Angone). This court finds that the extraordinary commitment on the part of those who commit graffiti points to the conclusion that the ordinances in themselves will not deter the incidents of graffiti in Chicago. Commitment alone, of course, is insufficient to overcome all obstacles of regulation. Nonetheless, when such commitment is viewed in conjunction with other factors, including (1) the availability of alternate sources of spray paint and large markers, (2) the availability of substitute materials to effect graffiti, and (3) the ordinances' failure to increase the risk of apprehension, it becomes evident that the ordinances in question have little possibility of furthering the City's objective.

(ii) *Availability of Alternate Sources*

19. Both Drs. Charles Cicchetti and Louis Wilde, designated by the City to testify as to the likely impact of the challenged ordinances on the level of graffiti in Chicago, approached the task from the perspective of a cost-benefit, economic theory. In short, Cicchetti and Wilde posited that if the ordinances increase (1) the time required to seek out alternate sources of spray paint and large markers, and (2) the material and transportation costs associated with obtaining such alternate sources, then the overall graffiti level

in Chicago will decrease as (i) fewer participants will enter into the tagging population, and (ii) those involved will decrease the frequency and intensity of their graffiti vandalism. R614–18 (Cicchetti); R885–86 (Wilde). We accept this theory as sound. Cicchetti and Wilde's respective opinions, however, that the ordinances in fact will result in an over decrease in graffiti rests on an empirical assumption that the regulation will in fact increase the time, material and transportation costs associated with obtaining spray paint and large markers from alternate sources. The evidence presented by plaintiffs is contrary to this assumption.

20. The parties have stipulated that "[a] majority of persons who commit graffiti vandalism in Chicago are Chicago resident, and a minority of these persons are not Chicago residents." Final Pretrial Order, Exhibit A ¶ 10. For those non-residents committing graffiti vandalism in Chicago, it is axiomatic that the challenged ordinances have no impact on their cost of obtaining spray paint and large markers. For those who reside in Chicago, there is easy access, via both public and private transportation, to the suburbs where there are literally hundreds of outlets selling spray paint and large markers. See Plaintiffs' Trial Exhibit 2. Respecting the most often graffiti vandalized property, CTA buses and subway cars, these mobile targets travel to and from the suburbs on a routine basis. See Plaintiffs' Trial Exhibit 1. For many of the permanent property targeted by graffiti vandals, transportation time to the suburbs to acquire spray paint or large markers is less than ten minutes. See id.; R685–86 (testimony of Carmen Lomellin). As previously noted, both taggers and gang members in fact sojourn to the suburbs on a frequent basis. Consequently, given the availability of spray paint and large markers in the suburbs, the familiarity with and easy access to the suburbs of both gang members and taggers, and their strong motivation to obtain such items to commit graffiti, it is plain that the increased cost, if any, of obtaining spray paint and large markers will not decrease the incidents of graffiti in Chicago.

21. Additionally, to the extent that some graffiti vandalism may be discouraged from procuring spray paint and large markers in the suburbs, that does not mean that these individuals will have no access to these materials. First, as Lt. Angone readily admits, a large underground market for spray paint and large markers already exists in Chicago. Angone described the arrest of a supplier who was selling thousands of spray paint cans from three garages, responsible for up to 80% of the supply used by CTA vandals, at prices significantly cheaper than retail. R712–13; see also Plaintiffs' Trial Exhibit 136. Second, as Constance Mortell admitted, even if only a small number of writers or their suppliers went to the suburbs, they would likely bring back enough spray paint and large markers to supply other children who are part of the problem. Plaintiffs' Trial Exhibit 99, at 76. Third, there are a plethora of mail order and non-retail-licensed outlets for spray paint and large markers in the City of Chicago, all able and willing to meet the demand of local graffiti vandals.

(iii) *Availability of Substitute Materials*

22. Further undermining Cicchetti and Wilde's conclusion regarding the impact of the challenged ordinances on the incidents of graffiti in Chicago, is the current availability and use of homemade devices and other materials in aerosol cans to create graffiti. In addition to spray paint and large markers, Lt. Angone stated that graffiti is created with rollers, brushes, rags, wicks, non-aerosol cans, bottles, water balloons, homemade devices in which any kind of liquid paint or ink can be poured in, fingernail polish, lipstick, eyebrow pencils, melted wax, glue, and shoe polish. R710–12; Plaintiffs' Trial Exhibit 157, at 94–96, 223–25; see, e.g., Plaintiffs' Trial Exhibit 47 (homemade devices). Lt Romero provided a similar list. R818–21. Further, there are many aerosol products on the market which look and are applied like spray paint, including automotive undercoats, disc brake silencer, industrial layout fluid, gasket adhesive, battery protector, automotive belt dressing, tree wound dressing and industrial lubricants. R55–64 (testimony of Joseph Scaminace); see, e.g., Plaintiffs' Trial Exhibit 66. These products, not effected by the ban, can, and likely will, be used to create

graffiti with no more time or material cost than that associated with spray paint and large markers. Further, many of these devices and products are no larger than spray paint and, thus, as easy to conceal. Many are no more clumsy to apply.

23. Another likely effect of banning spray paint and large markers will be an increase in other, and more destructive, forms of graffiti, such as etching and stickers. As a CTA maintenance worker commented in a videotape prepared by the CTA: "[Graffiti writers] use etchers, knives, scraper blades, and if they can't paint it, then they'll scrape and etch to mark it, so, the cost is going to eventually come back to you." Plaintiffs' Trial Exhibit 49. Jay Beswick testified regarding the numerous small and easily concealable items that can be used to scratch a tag into a glass window or other surface. R422–23; see, e.g., Plaintiffs' Trial Exhibit 48 (etching tools). Like etching, stickers are a popular form of graffiti in that they can be covertly applied in very little time. R227–28 (testimony of Devon Brewer). In sum, given the motivation of graffiti vandals, even a complete elimination of spray paint and large markers will not eliminate graffiti; rather, it will cause juveniles to turn to other applicators to effect graffiti.

(iv) *Risk of Apprehension*

24. Finally, in arriving at his conclusion respecting the likely deterrent effect of the challenged ordinances, Dr. Wilde considered a factor he labelled "risk of apprehension." According to Wilde, to the extent that the ordinances increased writers' fear of being caught applying or preparing to apply graffiti, the incidents of graffiti will decrease in Chicago. R887–88. Wilde speculates that the ordinances in question will increase writ-

ers' risk of apprehension in that (1) if it takes longer to commit an act of graffiti without spray paint or large markers, exposure time is increased, and (2) the possession ordinance makes it easier to arrest individuals because intent is irrelevant. *Id.*

25. Contrary to Wilde's first assumption, the evidence presented in this case, as discussed in the preceding section, indicates that graffiti can be applied with alternate materials as quickly as it can be applied with spray paint or large markers. Thus, exposure time cannot be considered a factor increasing the risk of apprehension.

26. In general, whether persons engaged in criminal conduct will possess an increased fear of apprehension in the face of a change in law presents a complex question. Indeed, the speculation involved is ordinarily enough to presume the new law will in fact increase apprehension and, thus, decrease criminal conduct. In the instant case, however, the impact on graffiti writers' apprehension level associated with the challenged possession ordinance is a non-issue. The City already prohibits minors from possessing spray paint and large markers regardless of their intended use. Municipal Code of Chicago, § 8–16–095. In that minors commit almost all of the graffiti in Chicago, all in violation of § 8–16–095, adding a new law, which as to these individuals duplicates the efforts of an existing law, will not add to the risk of apprehension. *See* R899–900 (testimony of Dr. Wilde) (if it is currently illegal for minors to possess spray paint and large markers irrespective of intent, then the risk of apprehension would not change with the addition of § 8–4–130(a)).[3]

3. We observe that Public Act 88-0406, enacted since the close of evidence in this case, provides City law enforcement with a powerful new weapon in its battle against graffiti. That act amends both the Juvenile Court Act of 1987, 705 ILCS 405/5–19, amends and adds a new section to the Criminal Code of 1961, 720 ILCS 5/21–1, and amends the Parental Responsibility Law, 740 ILCS 115/3. In essence, the new act allows police to charge graffiti vandals with criminal defacement of property. A second conviction under the act is considered a Class 4 felony, and is punishable with at least a year in jail and a

maximum of 120 hours of community service. Previously, acts of graffiti were considered misdemeanors. According to Lt. Angone, "This isn't what [graffiti writers] are used to. When word gets out about this, I'm sure it's going to help us quite a bit. It's going to be a big surprise to them." *Police Hope New Law, Arrests Send Stern Message to Graffiti Artists,* Chi.Trib., Sept. 20, 1993, § 2, at 3. This new law further diminishes the possibility that enforcing the challenged ordinances will result in an increased risk of apprehension.

### E. Expected Burdens Imposed by the Challenged Ordinances

27. That the challenged ordinances will not fulfill or even significantly advance the City's laudable goal of eradicating graffiti vandalism is only half of the story. In this section we consider the likely hardships created by the challenged ordinances.

28. The City does not contest that spray paint has many legitimate and beneficial uses, including painting furniture, railings, radiators, barbecue grills, lawn and garden equipment, fences, toys, cars, appliances, and cabinets; work involving stencils; hobby and crafts projects; art and theater uses; safety and hazard markings; and many other activities by homeowners preserving and improving their property. R139–40 (testimony of Thomas Flavin); R300–02 (testimony of Neil Barry). Likewise, there are many legitimate and beneficial uses of large markers. To be sure, we observe that the markers used by the City to create their demonstrative exhibits during trial contained a non-water soluble fluid and had a writing surface of greater than ⅜ of an inch. For many uses of spray paint and large markers, there are no adequate substitutes. R172–73 (testimony of Thomas Flavin); R302–18 (testimony of Neil Barry); see, e.g., Plaintiffs' Trial Exhibits 5–8. Thus, in the face of the challenged ordinances, Chicago consumers of spray paint and large markers will be faced with undesirable choices, including: (1) spending limited free time traveling to the suburbs to acquire spray paint or large markers; (2) purchasing a substitute good, if available; or (3) abandoning the project altogether.

29. To establish the likely sales losses to Chicago retailers and manufacturers of spray paint, plaintiffs presented the testimony of John W. Skorburg, currently the Chief Economist of the Chicagoland Chamber of Commerce. According to Skorburg, over the next six years alone, Chicago retailers (and thus manufacturers who make spray paint primarily in plants outside of Illinois) would lose over 55 million dollars in direct sales. Plaintiffs' Trial Exhibits 9, 88. Additionally, in that approximately 40% of current Chicago consumers of spray paint would go to the suburbs to purchase the product, Skorburg estimates that, over the next six years alone, Chicago retailers would lose over 50 million dollars in peripheral sales. Plaintiffs' Trial Exhibits 9, 88. Large markers would comprise some percentage of the lost peripheral sales. See R141 (testimony of Thomas Flavin) (large markers are "an accommodation sale").

30. In that most Chicago retailers operate on small profit margins, the loss of these sales stemming from a ban on the retail sale of spray paint and large markers may drive a substantial number of retailers out of business. See R171–72 (testimony of Thomas Flavin); R477 (testimony of Thomas Daly). Retailers who would remain in business would likely suffer a significant loss of customers. R477; Plaintiffs Trial Exhibits 89, 90. Manufacturers would be forced to cut capital investment and employment. R45–51 (testimony of Joseph Scaminace).

31. In an effort to discredit Skorburg's calculations, the City relied on the testimony of Michael Kennelly, a consultant with the Arthur Anderson Company. Kennelly's calculations, under which he still estimated tens of millions of dollars in lost retail sales over the next six years, differed from Skorburg's in two major respects. First, Kennelly used a different starting figure regarding the number of cans of spray paint filled in 1993. Second, Kennelly did not include lost peripheral sales in his calculations. Kennelly's analysis in both regards is flawed. Respecting the number of spray paint cans filled in 1993, Kennelly's calculation assumed that over 80% of a can's content was paint concentrate as opposed to propellant. In fact, only 60% of a can's content is paint concentrate. R299 (testimony of Neil Barry). When Kennelly recalculated the number using the 60% figure, he came up with 350 million fills in 1993, extremely close to the 360 million figure used by Skorburg. R856 (testimony of Michael Kennelly). Kennelly's refusal to acknowledge lost peripheral sales is not only contrary to his own prior calculations, see Plaintiffs' Trial Exhibit 117, R861–63, but also to the testimony of Charles Cicchetti, upon whom Kennelly purportedly relied. See R634 (testimony of Charles Cicchetti) (admitting that consumers who will travel to

the suburbs for spray paint are likely to purchase other products as well).

32. We observe that, although plaintiffs' have demonstrated a substantial burden on interstate commerce flowing from the ban on the retail sale of spray paint and large markers, plaintiffs have presented no testimony concerning the burdens stemming from the possession ordinance. Rather, plaintiffs assert that, if enforced as written, § 8–4–130(a) will cause the same harms as those discussed regarding the retail sales ban in § 4–132–150. R538–39. Without some testimony on the matter, however, this court will not equate the harms flowing from each ordinance. True, as written, the possession ordinance imposes burdens on purchasers of spray paint and large markers. And, those burdens may indeed result in a negative impact on interstate commerce. However, in that those burdens are distinct from those imposed under the provision completely banning the retail sale of such products, we require competent testimony to conclusively establish the precise impact on interstate commerce and, in the absence of such testimony, we will not speculate as to the extent of those burdens.

### F. *Reasonable Alternatives to the Challenged Ordinances*

33. Throughout this lawsuit, the City has contended that the challenged ordinances were not the first step taken to combat graffiti. Rather, according to the City, the challenged ordinances represent a more aggressive approach than the multi-pronged programs it had implemented in the past. The City would have this court believe that the advanced ban is the only option left to effectively combat graffiti. *See* Defendant City of Chicago's Trial Brief at 16 (June 22, 1993) ("Finally, there are no less restrictive alternatives for addressing graffiti vandalism. The City has actively pursued less restrictive means of combatting graffiti vandalism, and still the proliferation of graffiti increases."). This assertion is belied by the testimony, and is contradicted by the implementation dates of the programs the City touted at trial.

34. Although the City has made concerted efforts to combat graffiti, it has not tried all reasonable measures short of a ban of spray paint and large markers prior to passing the challenged ordinances. The City introduced a substantial amount of testimony concerning its three-pronged effort to combat graffiti, including education, eradication and enforcement. R652–73 (testimony of Carmen Lomellin). This effort comprises an aggregation of nine separate programs. As Lomellin admitted, the vast majority of these programs were established after the filing of this lawsuit. R677–80. For those programs in existence prior to May of 1992, the City's funding had declined in years prior to the passage of the challenged ordinances. For instance, the Police Department's education program, which the City heralded as a key element of its anti-graffiti effort, steadily declined in funding from $9,600 in 1983 to $4,400 in 1990. Plaintiffs' Trial Exhibit 105; Defendant's Trial Exhibit 35. This is not to say that the City's recent anti-graffiti efforts are not laudable. To the contrary, as the City represents, they constitute a substantial step toward the eradication of Chicago's graffiti problem. They also demonstrate that, at the time the City passed the challenged ordinances on May 20, 1992, many measures of eliminating graffiti short of a ban on spray paint and large markers stood unexplored.

35. Further, to the extent that the City denies that any measures short of a ban on spray paint and large markers will be unsuccessful in reducing the graffiti problem in Chicago, we disagree. Certainly, the combination of vigorous law enforcement and prompt removal of graffiti has been successful with respect to the subway systems in both New York, R786, 804–05 (testimony of Lt. John Romero), and Chicago. R723–24 (testimony of Lt. Robert Angone); Plaintiffs' Trial Exhibits 35, 36, 144. The subsequent problems of the CTA may very well be attributable to a faltering in effort and commitment. For instance, when Lt. Angone was transferred from the Public Transportation Section's anti-graffiti squad, arrests dropped abruptly; when he returned, arrests again rose. R721–22. Other programs, including educational efforts and the introduction of legal graffiti zones or permission walls, offer promising means to combat the problem.

*See* Plaintiffs' Trial Exhibits 28, 37, 149. In short, while no easy solution exists, other alternatives were left unexplored or abandoned prior to the adoption of the challenged ordinances on May 20, 1992.

## II. CONCLUSIONS OF LAW

### A. *Standing*

■ 1. In light of the evidence presented at trial and the change in plaintiffs since the filing of the complaint, we are compelled to revisit our previous ruling respecting plaintiffs' standing to challenge § 8–4–130(a), the possession ordinance. As was the case in confronting the question in connection with the City's motion to dismiss, the only contested issue is whether plaintiffs have shown that they have suffered an actual or threatened injury stemming from the enactment of § 8–4–130(a). In previously holding that plaintiffs have met this burden, we reasoned: "The fear of prosecution under § 8–4–130(a) of those plaintiffs who anticipate possessing, without consent, spray paint and large markers in Chicago's public buildings, public facilities or on the property of another is a sufficient threatened injury to meet the 'injury in fact' requirement of *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)." *National Paint & Coatings Ass'n,* 803 F.Supp. at 141 (citing *Kucharek v. Hanaway,* 902 F.2d 513, 516 (7th Cir.1990)). Since our prior ruling, however, those plaintiffs who would possess such a fear have all dropped out of the lawsuit. In that none of the remaining plaintiffs possess a reasonable fear of prosecution, they must demonstrate some other injury to confer standing.

■ 2. To salvage their standing, the remaining plaintiffs point to the likelihood of lost sales resulting from consumers' anticipated reaction to the possession ordinance. Indeed, indirect losses in sales attributable to a challenged regulation is generally sufficient to confer standing. *See Government Suppliers Consolidating Serv. v. Bayh,* 975 F.2d 1267, 1274 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 977, 122 L.Ed.2d 131 (1993). In the instant case, we speculated

that "it is reasonable to conclude that [the] fear of prosecution will result in financial losses to those plaintiffs who sell such items, as consumers change their consumption patterns to avoid prosecution under the possession ordinance." *National Paint & Coatings Ass'n,* 803 F.Supp. at 141. However, while such speculation may have been sufficient to avoid dismissal prior to trial, it did not alleviate plaintiffs' obligation to present some evidence at trial to support the contention that they will suffer economic injury resulting from the possession ordinance. As discussed above, plaintiffs have failed to present such testimony and, as such, we can only conclude that they lack standing to challenge the possession ordinance.

### B. *Commerce Clause*

■ 3. In Count I of their complaint, plaintiffs contend that § 4–132–150 violates the commerce clause of the United States Constitution. We have previously held that this ordinance on its face applies even-handedly between intra- and inter-state commerce, attempts to advance a legitimate local interest, and only incidently impacts interstate commerce. *National Paint & Coatings Ass'n,* 803 F.Supp. at 142–43. Thus, under *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), we will uphold the legislation "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." This question parts from the legislative purposes as espoused, instead focusing on the extent of the burdens imposed by, and the benefits derived from, the ordinance. It is an empirical question—"one of degree." *Pike,* 397 U.S. at 142, 90 S.Ct. at 847.

■ 4. As the City has aptly noted, ours is a necessarily confined judicial role. Certainly, the United States Constitution does not compel the City of Chicago to subscribe to any particular means of combatting the problem of graffiti. As such, this court will not " 'second-guess the empirical judgments of lawmakers concerning the utility of legislation. . . .' " *CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 92, 107 S.Ct. 1637, 1651, 95 L.Ed.2d 67 (1987) (quoting *Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 679,

101 S.Ct. 1309, 1320, 67 L.Ed.2d 580 (1981) (Brennan, J., concurring)). As the Seventh Circuit has recently reaffirmed, however, this is not to suggest that legislation neutral on its face and espousing a laudable goal is immune from scrutiny under the Commerce Clause. *Government Suppliers Consolidating Serv.*, 975 F.2d at 1285–86 (invalidating state legislation touching upon health and safety under the *Pike* balancing test). " 'Regulations designed for that salutary purpose nevertheless may further the purposes so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause.' " *Id.* at 1286 (quoting *Kassel,* 450 U.S. at 670, 101 S.Ct. at 1316).

■ 5. In the instant case, plaintiffs have clearly demonstrated that the retail ban on the sale of spray paint and large markers will have virtually no deterrent effect whatsoever on those who commit graffiti, taggers and gang members. The only persons likely to forgo the use of spray paint and large markers are the substantial number of adults who will abandon their legitimate projects because no adequate substitute exists and they are not as motivated as the vandals to go to the suburbs to acquire such products otherwise banned in Chicago. As a result, retailers and manufacturers of these goods will suffer losses of potential sales in the tens of millions of dollars. Additionally, Chicago retailers will lose law-abiding customers and, thus, the sales of other products peripheral to spray paint and large markers. Under these circumstances, § 4–132–150 is invalid under the commerce clause of the United States Constitution.

## C. *Substantive Due Process*

■ 6. State ordinances can be said to deny substantive due process only if they do not bear a rational relationship to a legitimate governmental interest. *Williamson v. Lee Optical Co. of Oklahoma, Inc.,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955); *Nebbia v. New York,* 291 U.S. 502, 524–25, 54 S.Ct. 505, 510, 78 L.Ed. 940 (1934); *Coniston Corp. v. Village of Hoffman Estates,* 844 F.2d 461, 467 (7th Cir.1988); *Vaden v. Village of Maywood,* 809 F.2d 361, 364 (7th Cir.), *cert. denied,* 482 U.S. 908, 107

S.Ct. 2489, 96 L.Ed.2d 381 (1987); *Waste Management of Illinois, Inc. v. Metropolitan Water Reclamation Dist. of Greater Chicago,* 1989 WL 56917, at *2–3 (N.D.Ill. May 23, 1989). Within this context, the Seventh Circuit has held that legislation does not bear a rational relationship to a legitimate governmental interest only if it is "arbitrary and unreasonable," *i.e.,* "invidious or irrational." *Coniston Corp.,* 844 F.2d at 467; *Burrell v. City of Kankakee,* 815 F.2d 1127, 1129 (7th Cir.1987).

■ 7. The ordinance in question, § 4–132–150, is a rarity in that it purports to ban the retail sale of spray paint and large markers simply because a small percentage (estimated at approximately 1%, *see* R422, 461) of the products are misused by graffiti vandals. The constitutionality of such a blunt approach has been questioned by at least one court. As the court stated in *Bambu Sales, Inc. v. Gibson,* 474 F.Supp. 1297, 1305 (D.N.J.1979), it would be unconstitutional "to make it an offense to provide coin or currency to another merely because coin and currency are 'ordinarily used' for gambling," or to prohibit the sale of "such articles as potatoes, barley, corn, sugar, molasses or yeast merely because these articles, as well as any other starch or sugar, can be fermented to manufacture alcoholic beverages. The same applies to vessels and piping, which can be used for distillation." This unfavored approach, when coupled with overwhelming evidence that the legislation will not advance the City's goal of eradicating graffiti, leads the court to conclude that § 4–132–150 is "irrational" and, hence, violates plaintiffs' right to substantive due process as guaranteed under the United States Constitution.

## D. *The City's Police Power*

■ 8. Article VII, § 6(a) of the Illinois Constitution authorizes local governments, such as the City of Chicago, to function as home rule units to "exercise any power and perform any function pertaining to its government and affairs." Pursuant its police power, the City may " 'restrict or prohibit the exercise of a legitimate trade where it is necessary for the protection of the public health, morals, safety or welfare.' " *Opyt's*

*Amoco, Inc. v. The Village of South Holland,* 149 Ill.2d 265, 269, 172 Ill.Dec. 390, 392, 595 N.E.2d 1060, 1062 (1992) (quoting *Figura v. Cummins,* 4 Ill.2d 44, 122 N.E.2d 162 (1954)). To constitute a legitimate exercise of the police power, municipal regulation "must bear a reasonable relationship to the public interest sought to be protected and the means adopted must be a reasonable method of accomplishing the chosen objective." *Id.* (citing *Crocker v. Finley,* 99 Ill.2d 444, 77 Ill.Dec. 97, 459 N.E.2d 1346 (1984)); *see also Finish Line Express, Inc. v. City of Chicago,* 72 Ill.2d 131, 138, 19 Ill.Dec. 626, 628, 379 N.E.2d 290, 292 (1978); *Midwest Petroleum Marketers v. City of Chicago,* 82 Ill.App.3d 494, 500, 37 Ill.Dec. 707, 712, 402 N.E.2d 709, 714 (1st Dist.1980). Once the legislative body determines that a problem exists and acts to protect and promote the general welfare of its citizens, the legislation is presumed to be a valid exercise of the City's police power. *Opyt's Amoco,* 149 Ill.2d at 269, 172 Ill.Dec. at 392, 595 N.E.2d at 1062; *Midwest Petroleum Marketers,* 82 Ill.App.3d at 500, 37 Ill.Dec. at 712, 402 N.E.2d at 714 (citing *Union Cemetery Ass'n v. Cooper,* 414 Ill. 23, 110 N.E.2d 239 (1953)). The mere fact that the legislature has invoked the police power, however, is not conclusive that the power was lawfully exercised; it remains within the province of the court to determine that issue. *Opyt's Amoco,* 149 Ill.2d at 269, 172 Ill.Dec. at 392, 595 N.E.2d at 1062 (citing *Figura,* 4 Ill.2d at 49, 122 N.E.2d at 165).

9. As we have previously observed, the standards set forth above involve the same inquiry as those employed in our substantive due process analysis. *National Paint & Coatings Ass'n,* 803 F.Supp. at 147. Consequently, for the reasons stated *supra* subsection II(C) of this opinion, we conclude that § 4–132–150 constitutes an illegitimate exercise of the police power afforded the City of Chicago under the Illinois Constitution.

### III. CONCLUSION

For the reasons set forth above, we hold: (1) plaintiffs lack standing to challenge § 8–4–130(a), the possession ordinance; and (2) § 4–132–150, banning the retail sale of spray paint and large markers (i) imposes an impermissible burden on interstate commerce, (ii) violates plaintiffs' right to substantive due process as guaranteed under the United States Constitution, and (iii) constitutes an illegitimate exercise of the police power afforded the City of Chicago under the Illinois Constitution. Consequently, plaintiffs' prayer for declaratory and injunctive relief is granted as it relates to § 4–132–150 of the Municipal Code of Chicago and denied as to § 8–4–130(a) of the Municipal Code of Chicago. It is so ordered.