**NATIONAL PAINT & COATINGS ASSOCIATION, et al., Plaintiffs–Appellees,**

v.

**CITY OF CHICAGO, Defendant– Appellant.**

No. 93–3969.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 28, 1994.

Decided Jan. 24, 1995.

Steven P. Handler (argued), Bruce H. Weitzman, Paul M. Weiss, McDermott, Will & Emery, Chicago, IL, for plaintiffs-appellees National Paint & Coatings Ass'n et al.

Cynthia Anne Cohan, Thomas G. Dent, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for plaintiff-appellee Sherwin–Williams Co.

Lawrence Rosenthal, Deputy County Counsel, Benna R. Solomon, Stuart D. Fullerton (argued), Susan S. Sher, Office of Corp. Counsel, Appeals Div., Chicago, IL, for defendant-appellant.

Before EASTERBROOK, MANION, and ROVNER, Circuit Judges.

EASTERBROOK, Circuit Judge.

Graffiti cover more than five million square feet of walls, signs, windows, and other public surfaces in Chicago. Full-time crews patrol the streets removing paint, but they are losing ground. Vandalism and trespass are crimes, but prosecution has not sufficed. In May 1992 Chicago decided to do something more: to lump spray paint and jumbo markers, the principal tools of the graffiti "artist," with burglars' tools and other criminal implements as contraband. An ordinance forbids the sale of spray paint and jumbo indelible markers (collectively spray paint) within the city limits. Chicago Municipal Code § 4–132–150 (1992). The fine for each violation: $100.

### I

Plaintiffs in this suit, a consortium of makers, wholesalers, and retailers of paint and markers, contend that this ordinance and a related law enacted at the same time exceed Chicago's home-rule powers under Illinois law and violate the Constitution of the United States to boot. Over the objection of the City, the district court held a trial and concluded, after hearing evidence for six days, that a ban will not work. 835 F.Supp. 421 (N.D.Ill.1993). The court found that the vandals live, eat, and breathe graffiti, that they are so committed to producing narcissistic displays that they are undeterrable—not by fines, anyway. Although the law will dry up the supply of spray paint at retail outlets in Chicago, the vandals can obtain their needs in the suburbs and continue their rampage. Another ordinance forbids the possession of spray paint "on the property of another" or in any public building or facility. Chicago Municipal Code § 8–4–130(a). Although the plaintiffs no longer challenge this law (the district court held that they lack standing to do so), the judge believed that even the combination of a ban on sales and a severe restriction on possession would fail. Because the ordinances will not work, they are, the court believed, unconstitutional—for it is irrational to deprive the law-abiding 99% of spray paint users of a substance for which they have productive uses when the deprivation does not accomplish anything. The district court concluded that the ban on sales therefore violates the dormant commerce clause and principles of substantive due process, and that it also exceeds Chicago's home-rule powers. It enjoined enforcement of the ordinance. The injunction has remained in effect pending appeal.

The district court treated the extent of the City's powers as an afterthought, mentioning the subject (and holding the ordinance invalid on this basis) only after considering and resolving both of plaintiffs' constitutional claims. 835 F.Supp. at 434–35. Yet if a sufficient non-constitutional ground of decision is available, a court must begin *and end* there. *New York City Transit Authority v. Beazer*, 440 U.S. 568, 582–83, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1979). Constitutional adjudication is a last resort, and courts should do what they can to decide on other grounds. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501, 105 S.Ct. 2794, 2800, 86 L.Ed.2d 394 (1985); *Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944). As it turns out, however, the City's home-rule powers are quite sufficient to enact this ordinance. A home-rule unit in Illinois may "regulate for the protection of the public health, safety, morals and welfare". Ill. Const. art. VII § 6(a). This "provision was written with the intention that home-rule units be given the broadest powers possible." *Scadron v. Des Plaines*, 153 Ill.2d 164, 174, 180 Ill.Dec. 77, 81, 606 N.E.2d 1154, 1158 (1992). See also, e.g., *Bolingbrook v. Citizens Utilities Co.*, 158 Ill.2d 133, 198 Ill.Dec. 389, 632 N.E.2d 1000 (1994). Some state

cases contain stray language implying that courts may assess the wisdom of legislation, e.g., *Crocker v. Finley*, 99 Ill.2d 444, 457, 77 Ill.Dec. 97, 103, 459 N.E.2d 1346, 1352 (1984), but in the main the Supreme Court of Illinois has permitted cities the same leeway the Supreme Court of the United States affords to the states. E.g, *Triple A Services, Inc. v. Rice*, 131 Ill.2d 217, 227–34, 137 Ill.Dec. 53, 59–60, 545 N.E.2d 706, 711–13 (1989); *Cutinello v. Whitley*, 161 Ill.2d 409, 421–22, 204 Ill.Dec. 136, 140–41, 641 N.E.2d 360, 364–65 (1994). The district court's conclusion was parasitic on its constitutional holding: it reasoned that cities lack authority to enact irrational laws. Whether that is so as a matter of Illinois law does not matter; it is plain that the home-rule question is not an *independent* state ground of decision, and we therefore turn to the constitutional claims.

## II

Are the benefits of spray paint worth the costs in defacement of property by vandals? Will limits on the sale and possession of spray paint reduce graffiti by enough to justify the inconvenience they create for those who use the product without harming others? Will the vandals find an adequate supply in the suburbs or perhaps turn to substitutes such as automotive undercoating? These are important questions, but the Constitution commits their decision to the political branches of government. The power to decide, to be wrong as well as to be right on contestable issues, is both privilege and curse of democracy.

■ Not willing to accept the legislative answer to these questions, the district judge took evidence and gave his own answers. Chicago does not contend that the judge's answers are wrong; instead it contends that they are irrelevant, because holding the trial in the first place usurped the legislative power. Indeed so: a legislative decision "is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Communications, Inc.*, — U.S. —, —, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993). See also, e.g., *Nordlinger v. Hahn*, — U.S. —, —, 112 S.Ct. 2326, 2334, 120 L.Ed.2d 1 (1992); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463–65, 101 S.Ct. 715, 723–24, 66 L.Ed.2d 659 (1981); *Vance v. Bradley*, 440 U.S. 93, 111, 99 S.Ct. 939, 949–50, 59 L.Ed.2d 171 (1979). "[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Heller v. Doe*, — U.S. —, —, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993) (citations omitted). Even in litigation about torts and contracts, a court holds evidentiary hearings only when necessary to resolve material disputes of fact. In constitutional law, to say that such a dispute exists—indeed, to say that one may be *imagined*—is to require a decision for the state. Outside the realm of "heightened scrutiny" there is therefore never a role for evidentiary proceedings. By holding a trial, the district court conceded that there were material factual disputes—as there were. Two respected economists testified that the ordinance effectively raises the price of spray paint in Chicago, leading to a reduction in its use. How *much* of a reduction was hotly disputed, but no one can doubt that thoughtful people could conclude that there will be *some* reduction. See *44 Liquormart, Inc. v. Rhode Island*, 39 F.3d 5, 7–8 (1st Cir.1994). The district court therefore should not have conducted a trial, and we disregard its conclusions.

■ A person challenging the regulation of economic transactions must "negative every conceivable basis which might support" the rule. *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973) (citation omitted). Chicago offers a "conceivable basis"— that is to say, a rational argument—for its law. Reducing the availability of spray paint has a tendency to reduce its use. Raising the price of spray paint has a similar tendency. The combination of the travel costs to procure spray paint from the suburbs, plus a fine when one is caught red-handed with a can, is the functional equivalent of a price increase. It may be, as the district court believed, that the taggers (as the vandals call themselves) are committed to graffiti as a way of life, but this affects only the degree to which the statute will be effective. Actually,

the statute may have a substantial effect even if the district court is right about the degree of taggers' commitment to their pastime. Persons who are already taggers may not change their behavior much, but it will become harder to recruit new taggers, and some taggers will leave the lifestyle sooner. The district court found that persons between the ages of 12 and 20 commit almost all of the graffiti vandalism; if the law restricts the age range to 13–19 it will have benefits even if none of the practicing taggers reduces his "output."

■ What is more, a legislature rationally may conclude that even the most committed of taggers will alter his behavior. That fines and other criminal punishments deter misconduct is a rational belief backed up by a significant body of evidence. See *United States v. Turner,* 998 F.2d 534, 536–37 (7th Cir.1993) (collecting studies). When prices of normal goods rise, people consume less. There are even constitutional doctrines based on this—consider, for example, the understanding that license fees and the risk of tort judgments "chill" speech. E.g., *Riley v. National Federation of the Blind of North Carolina, Inc.,* 487 U.S. 781, 794–95, 108 S.Ct. 2667, 2676, 101 L.Ed.2d 669 (1988). How legislation based on the proposition can be "irrational" eludes us. The district judge treated the taggers as if they were addicts and deemed them immune from economic incentives. It turns out, however, that consumption of addictive substances follows normal economic principles. Take cigarettes. Smokers turn out to be highly responsive to information about health risks. W. Kip Viscusi, *Smoking: Making the Risky Decision* (1992). A reduction in health and an increase in health care expenditures are equivalent to a higher (but deferred) price. Cigarette smoking is quite responsive to changes in explicit prices, too. See Gary S. Becker, Michael Grossman & Kevin M. Murphy, *An Empirical Analysis of Cigarette Addiction,* 84 Am.Econ.Rev. 396 (1994) (elasticity of about 0.75 for long-run change in cigarette prices). Yet one could have said about smokers the same things the district judge said about taggers. Because addicts, criminals, and the like respond to incentives, a

legislature rationally may attempt to influence them by changing prices and penalties.

■ Availability of spray paint in the suburbs, and of undercoating in Chicago, reduces the effectiveness of the statute, but a rational legislature could conclude that some effect remains. Many persons believe that restrictions on guns, fireworks, and liquor (to name only three of the hazardous products that local governments regulate) are defeated by movements from unregulated jurisdictions. Yet people of good will (and possessed of ample information) debate the extent of this effect; the existence of the debate establishes that the Constitution does not dictate the outcome. Legislatures often enact laws that reduce but cannot eliminate the effects of movements across municipal and state borders. For example, Congress has forbidden radio and television stations with broadcast facilities in states that do not conduct lotteries to broadcast lottery ads and information—even if a significant portion of their signal falls in lottery states, and even if the non-lottery states are flooded by lottery ads and information broadcast from the neighboring lottery states. A judge concluded that this law is irrational because people in non-lottery states have many other ways to learn the information and buy lottery tickets, and because in the judge's view the people in lottery states should not be deprived of valuable information for such a speculative "benefit" to people in neighboring states. The Supreme Court reversed, holding that the "leakage" of information did not render the law invalid. *United States v. Edge Broadcasting Co.,* —— U.S. ——, —— – ——, 113 S.Ct. 2696, 2706–08, 125 L.Ed.2d 345 (1993). The district court's rationale in this case tracks the one the Supreme Court repudiated in *Edge Broadcasting.* If, even when speech is at stake, a legislature need not eradicate a problem to be entitled to make some progress, there can be no doubt about the power of a legislature to regulate spray paint. The district court's approach, by contrast, is hostile to all but national legislation, because movements of goods and people undercut almost all local laws. It would turn the structure of the Constitution on its head to adopt a principle that disables state and local

regulation and compels the national government to take over.

It may be, as plaintiffs say, that Chicago could have taken a path that would have given more leeway to those who use spray paint constructively. San Francisco restricts the availability of spray paint along the lines of prescription drugs. See *Sherwin–Williams Co. v. San Francisco,* 857 F.Supp. 1355 (N.D.Cal.1994) (holding the law constitutional). A legislature need not choose the least restrictive means of regulation, however. "If there are alternative ways of solving a problem, we do not sit to determine which of them is best suited to achieve a valid state objective." *Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 524, 79 S.Ct. 962, 965, 3 L.Ed.2d 1003 (1959).

Plaintiffs respond that this is all well and good for equal protection analysis, but they assert (and the district court held) that the ordinance is a violation of substantive due process. Now we have spent some time looking through the Constitution for the Substantive Due Process Clause without finding it. The fourteenth amendment contains an equal protection clause, and a due process clause, but no "due substance" clause. The word that follows "due" is "process." This court has held repeatedly that economic regulation must be evaluated under equal protection principles, and that laws supported by a rational basis are within the power of the elected branches of government. *River Park, Inc. v. Highland Park,* 23 F.3d 164 (7th Cir.1994); *Saukstelis v. Chicago,* 932 F.2d 1171, 1173–74 (7th Cir.1991); *Chicago Board of Realtors, Inc. v. Chicago,* 819 F.2d 732, 741–42 (7th Cir.1987). "The doctrine that ... due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely ... has long since been discarded." *Ferguson v. Skrupa,* 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963).

The doctrine that goes by the name "substantive due process" is not a rival to the established rational basis analysis of economic regulation. It is instead derived from the many constitutional rules that protect personal liberty from unjustified intrusions. The fact that it is a doctrine owing its existence to constitutional structure rather than a clear grant of power to the judiciary has led the Supreme Court to be cautious in its use. *Albright v. Oliver,* — U.S. —, — – —, 114 S.Ct. 807, 812–13, 127 L.Ed.2d 114 (1994) (plurality opinion); *Collins v. Harker Heights,* 503 U.S. 115, —, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992). Only laws that affect "fundamental rights" come within the purview of this doctrine. See *Reno v. Flores,* — U.S. —, —, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993).

One could scan the most wild-eyed radical's list of candidates for the status of "fundamental right" without encountering spray paint. Plaintiffs point to their licenses to do business, but these are property, not "fundamental rights." Many of the cases in the equal protection canon involved licenses, without the Court so much as hinting that a special rule applied. E.g., *New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). A license is nothing but a promise by the issuing body not to interfere in business conducted according to its terms. *River Park,* 23 F.3d at 166; *Toulabi v. United States,* 875 F.2d 122 (7th Cir.1989). Not since legislatures responded to the *Dartmouth College* case by reserving the right to alter the terms of charters and licenses have courts treated them as *substantive* bars to regulation. A license, as a species of property, may require the government to afford appropriate process. But the people, directly or through their legislature, may alter the substantive terms of the promise not to interfere in private economic transactions. See *Philly's, the Original Philadelphia Cheese Steak, Inc. v. Byrne,* 732 F.2d 87 (7th Cir. 1984) (holding that Illinois may allow each voting precinct to decide whether to permit the sale of liquor, even though a decision to "go dry" may extinguish rights held under licenses and even though customers may continue to buy liquor in neighboring precincts).

Plaintiffs all are corporations. Corporations do not have fundamental rights; they do not have liberty interests, period. Investors may have such rights, and inhibi-

tions on the conduct of organizations may influence investors' and members' ability to exercise their own rights. See *NAACP v. Alabama ex rel. Flowers,* 377 U.S. 288, 302–10, 84 S.Ct. 1302, 1311–15, 12 L.Ed.2d 325 (1964); *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). But plaintiffs do not assert that Chicago's ordinance directly or indirectly affects a fundamental right possessed by their investors. The only interest at stake is the interest in obtaining the maximum return on investment. That is not a "fundamental" right. The right of bakers to work for long hours, and thus to earn money for struggling families, is far more important to personal liberty, yet the days of *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), have passed. For substantive protections businesses must look to the takings clause of the Constitution, which does not forbid regulation but simply requires payment. (Plaintiffs do not contend that the ordinance takes their property without just compensation, or that it is a taking for private use.) When assessing economic regulation a court therefore must employ the rational-basis test, which Chicago's ordinance passes with room to spare.

## III

Plaintiffs have a final arrow in their quiver: the commerce clause, which, although in terms a grant of power to Congress, is today understood to imply some limitation on state power. They contend, and the district court held, that even if the ordinance is rationally related to a legitimate objective, it achieves its ends at an excessive price to interstate commerce. Most of the spray paint sold in Chicago comes from outside Illinois. This is enough, the district court held, to activate the balancing approach of *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), which it understood to authorize a comprehensive review of the law's benefits, free of any obligation to accept the legislature's judgment. Having disparaged the law's benefits, the district court thought that unconstitutionality under the dormant commerce clause followed.

■ Several years ago we disapproved exactly this approach, remarking that the dormant commerce clause does not replace the rational-basis inquiry with a "broader, all-weather, be-reasonable vision of the Constitution.... Although *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), sometimes is understood to authorize such general-purpose balancing, a closer examination of the cases may support the conclusion that the Court has looked for discrimination rather than for baleful effects. See Donald H. Regan, *The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause,* 84 Mich.L.Rev. 1091 (1986); Julian N. Eule, *Laying the Dormant Commerce Clause to Rest,* 91 Yale L.J. 425 (1982)." *Amanda Acquisition Corp. v. Universal Foods Corp.,* 877 F.2d 496, 505 (7th Cir.1989). The district court stated that *Amanda Acquisition* does not control because *Pike* has been applied by the Supreme Court since 1989, dissipating all doubts about its validity. 803 F.Supp. 135, 142 n. 4 (N.D.Ill.1992). This misunderstands both our point in *Amanda Acquisition* and the Supreme Court's commerce clause jurisprudence, so we recapitulate. Our court has not questioned the "validity" of *Pike* (for an inferior court must apply the Supreme Court's decisions without regard to doubts about their wisdom); we were, and are, obliged to determine the proper scope of its application.

■ Interstate communication and transportation is pervasive. Because even "local" activities displace the movement of goods, services, funds, and people, almost every state and local law—indeed, almost every private transaction—affects interstate commerce. This is why the commerce clause authorizes Congress to regulate so many details of daily life. E.g., *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991) (exclusion of a single physician from a single hospital affects interstate commerce); *Russell v. United States,* 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985) (arson of a two-unit apartment building affects interstate commerce); *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (farmer's consumption of bread baked from own wheat affects interstate

commerce). See also *New York v. United States*, — U.S. —, —, 112 S.Ct. 2408, 2419, 120 L.Ed.2d 120 (1992) ("As interstate commerce has become ubiquitous, activities once considered purely local have come to have effects on the national economy, and have accordingly come within the scope of Congress' commerce power."). But see *United States v. Lopez*, 2 F.3d 1342 (5th Cir.1993), cert. granted, — U.S. —, 114 S.Ct. 1536, 128 L.Ed.2d 189 (1994) (argued Nov. 8, 1994); *United States v. Robertson*, 15 F.3d 862, 868–69 (9th Cir.), cert. granted, — U.S. —, 115 S.Ct. 354, 130 L.Ed.2d 309 (1994). If the balancing approach of *Pike* supplied the standard applicable to all laws affecting commerce—that is, to all state and local laws addressing a subject that Congress *could* regulate, if it chose—then judicial review of statutory wisdom after the fashion of *Lochner* would be the norm. Not so, because *Pike* is not universally applicable. *K–S Pharmacies, Inc. v. American Home Products Corp.*, 962 F.2d 728 (7th Cir.1992).

State and local laws affecting commerce may be put into one of three categories. (The classification of a particular law may be difficult, but that does not concern us here.) The first category comprises laws that explicitly discriminate against interstate commerce. Chicago might, for example, forbid the sale of spray paint manufactured outside Illinois. Such laws are treated as all but *per se* unconstitutional. E.g., *C & A Carbone, Inc. v. Clarkstown*, — U.S. —, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994); *West Lynn Creamery, Inc. v. Healy*, — U.S. —, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994). Chicago's law does not fall into this category, however; it bans all spray paint without regard to source.

The second category comprises laws that appear to be neutral among states but that bear more heavily on interstate commerce than on local commerce. One state's law setting a 55–foot limit for trailers when all nearby states permit 65–foot trailers bears more heavily on vehicles from other states, which are limited in the places they may travel, while in-state vehicles may move freely to other states. See *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981). When the effect is powerful, acting as an embargo on interstate commerce without hindering intrastate sales, the Court treats it as equivalent to a statute discriminating in terms. See Daniel A. Farber & Robert E. Hudec, *Free Trade and the Regulatory State: A GATT's-Eye View of the Dormant Commerce Clause,* 47 Vand.L.Rev. 1401, 1411–18 (1994) (summarizing the factors that lead to this treatment). When the discriminatory effect is weak, however, the Court is more willing to entertain justifications that are unrelated to the suppression of interstate commerce. In *Pike* itself, the disparate effect was strong enough to require all cantaloupes sold in Arizona to be packed in that state, 397 U.S. at 140, 90 S.Ct. at 846, yet the restriction on supply from other states was not such an apparent objective of the law that the Court ruled out all possibility of justification. Like the law in *Clover Leaf Creamery*, which barred the sale of milk in plastic nonrefillable containers, to the potential detriment of suppliers in other states that had specialized in such containers, laws with mild disparate effects and potential neutral justifications are analyzed under *Pike*, and the state must establish that reasonable persons who held all states' interests in equal regard could think that net benefits remained. See also *Government Suppliers Contracting Services, Inc. v. Bayh*, 975 F.2d 1267 (7th Cir.1992).

If the first category may be called disparate treatment, and the second disparate impact, the third category comprises laws that affect commerce without any reallocation among jurisdictions—that do not give local firms any competitive advantage over those located elsewhere. Cases such as *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987), and *Amanda Acquisition* fit into this category, for which, we have held, the normal rational-basis standard is the governing rule. As *Exxon* remarks, "[t]he fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of *discrimination* against interstate commerce." 437 U.S. at 126, 98 S.Ct. at 2214

(emphasis added). Unless the law discriminates against interstate commerce expressly or in practical effect, there is no reason to require special justification. See also *J. Filiberto Sanitation, Inc. v. New Jersey Department of Environmental Protection,* 857 F.2d 913, 919–21 (3d Cir.1988); *Norfolk Southern Corp. v. Oberly,* 822 F.2d 388, 406 (3d Cir. 1987).

Where does Chicago's spray paint ordinance fit? If we accept the district court's findings of fact, it fits squarely in the third category—for the district court found that the law will be ineffectual, implying that it will not alter the flow of commerce at all. If, however, we assume that the law will curtail sales to law-abiding persons without affecting the vandals ("If spray paint is outlawed, only outlaws will have spray paint."), then the volume of spray paint moving into Illinois will diminish. Will this produce a relative advantage for Illinois firms (that is, will it have a disparate impact on interstate commerce)? Certainly not for Illinois retailers, who lose whatever profit spray paint yields. Given competition, this loss is not likely to be serious; retailers will earn a normal rate of return on invested capital whether or not they sell spray paint. At all events, the whole loss among retailers is felt locally. How about manufacturers and middlemen? The answer to that question depends on where consumers turn for substitutes after spray paint vanishes. The concern in cases of disparate impact is that they will turn preferentially to in-state suppliers: unable to ship in 65–foot trailers from out-of-state carriers, shippers will hire the 55–foot trailers from local firms, and so on.

■ To determine whether there is a disparate effect on interstate commerce, then, we need to know what consumers will replace spray paint with. A dispute between the parties on this subject might require a district court to activate its fact-finding apparatus; *Pike* may be impossible to apply without some factual inquiries (albeit limited as *Clover Leaf Creamery* requires). Yet despite the lengthy trial the district court did not make any findings on this subject. When we inquired at oral argument, we learned the reason: plaintiffs did not offer any evidence.

Apparently no one contends that substitutes for spray paint will come from inside Illinois to any greater degree than the spray paint itself does. If consumers turn to paint in cans, applied by brushes and rollers, they will obtain the product from the same firms that produce spray paint. If consumers turn to medium-sized indelible markers (those with tips smaller than ⅜″) they will find that the suppliers are the same out-of-state firms that make the jumbo variety. In sum, the ordinance affects interstate shipments, but it does not discriminate against interstate commerce in either terms or effect. No disparate treatment, no disparate impact, no problem under the dormant commerce clause. See also *Procter & Gamble Co. v. Chicago,* 509 F.2d 69 (7th Cir.1975) (holding that Chicago's ban on the sale of detergents containing phosphates—a measure that did not give any benefit to local manufacturers—satisfied the dormant commerce clause).

■ Perhaps Chicago's City Council has used too broad a brush. If so, the law-abiding residents of Chicago will be the losers, for they forfeit the benefits of spray paint without enjoying much, if any, reduction in vandalism. No more than the equal protection clause does the dormant commerce clause protect people against injuring themselves by overestimating the power of law to alter human events for good. Time and again social science research teaches that laws fail to achieve their goals—that the laws provoke costly adjustments that make the majority worse off. Just as the Constitution does not enact Mr. Herbert Spencer's *Social Statics,* so it does not enact prescriptions from the pages of *The Journal of Law & Economics*—where, we may assume, an article will appear in due course adding this ordinance to the long list of laws whose costs exceed their benefits. "[A] law can be both economic folly and constitutional." *CTS,* 481 U.S. at 96–97, 107 S.Ct. at 1653 (Scalia, J., concurring). Chicago's law may well be folly; we are confident that it is constitutional.

REVERSED.

ILANA DIAMOND ROVNER, Circuit Judge, concurring.

No one can doubt that graffiti vandalism poses a serious and vexing problem for the

City of Chicago and its residents. Yet, without minimizing the gravity of the problem, I must confess that I find the City's response—an outright ban on the sale of spray paint and large markers within the city limits—a bit dramatic. Under Chicago's ordinance, not only will graffiti vandals be deprived of lawful access to the tools of their trade, but so will law-abiding citizens who otherwise would have used the banned products for legitimate purposes.

Spray paint manufacturers and retailers were understandably upset by their exclusion from such a large market, and a consortium of out-of-state interests challenged the ordinance in federal court. In the course of a six-day bench trial, the parties explored at length the many vagaries of Chicago's graffiti problem and the anticipated effectiveness of the City's response. The able and experienced district judge found on the basis of the trial evidence that Chicago's ban violates the Commerce Clause because if enforced, the ordinance would substantially burden the flow of interstate commerce while furthering Chicago's purposes only marginally. From that conclusion, the court divined that the ordinance also violates principles of substantive due process and exceeds the City's home-rule powers under state law. The majority today disagrees with each of those conclusions, and in the process, chastises the lower court for conducting a trial designed to look behind Chicago's ordinance, rather than deferring to the judgment of its elected officials. I ultimately agree with my colleagues that Chicago's ban is not constitutionally infirm, but I write separately to clarify one point about the Commerce Clause and then to make two additional points about the majority's analysis.

I have no quarrel with the majority's treatment of the City's home-rule powers, as I agree that home-rule units have broad powers under the Illinois Constitution and that courts should second-guess the exercise of those powers by elected officials only in the most extreme cases. Although this may seem to some to be an extreme case, the problem of graffiti vandalism is a difficult one, and I agree that Chicago had the power to respond as it did.

I also commend the majority for its thorough and helpful treatment of what I see as the primary issue in this appeal—whether the resale ban violates the dormant Commerce Clause. *See ante* at 1130–32. I agree that this case falls into the last of the majority's three categories (*ante* at 1132) and that it resembles the legislation at issue in such cases as *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), and *CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). Although Chicago's ban on the sale of spray paint and large markers may impact the free flow of commerce amongst the states, it does so in a non-discriminatory fashion, both by its terms and in its effects. Plaintiffs never alleged, for instance, that in the face of this ban, Chicago consumers would turn to alternate products produced primarily in Chicago or the State of Illinois. Had they done so, their allegations in all likelihood would have activated the balancing test of *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970):

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

(Citations omitted.) And once that test has been activated, it seems to me that the questions it poses may only be answered by some form of evidentiary hearing.

My colleagues decree that the district court should have refrained from conducting a trial because reasonable minds could differ about the potential effects of the resale ban. *Ante* at 1127. That may be true solely as a matter of substantive due process, but it is not necessarily the case under the dormant Commerce Clause. If a plaintiff's allegations

are sufficient to establish that a facially neutral ordinance may have a discriminatory impact—that is, that it may have an incidental effect on interstate commerce—then *Pike*'s balancing test applies, and the district court may conduct evidentiary proceedings and even a trial to test the actual benefits and burdens of the legislation, regardless of what a reasonable legislator may have believed. It may consider as well whether the legislature's purpose might be achieved by some means having a lesser impact on interstate commerce. Indeed, that is how the Supreme Court has consistently understood *Pike*. *See, e.g., Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981) (reviewing evidence adduced in fourteen-day trial addressed to the benefits and burdens of state legislation); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 470–74, 101 S.Ct. 715, 727–29, 66 L.Ed.2d 659 (1981) (reviewing evidence adduced in extensive evidentiary hearings under *Pike*); *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 444, 98 S.Ct. 787, 795–96, 54 L.Ed.2d 664 (1978) (invalidating state regulation under *Pike* based upon the plaintiff's "massive array of evidence" which disproved the regulation's alleged benefit). A district court would not, in such a case, overstep its bounds by second-guessing the policy judgments of elected officials. It instead would act in the limited fashion envisioned by *Pike* to preserve the integrity of our interstate system of commerce.

Here, then, the district court erred not so much in deciding to conduct a trial, as the majority implies, but in deciding that *Pike* applies to Chicago's ordinance in the first place.[1] Had that decision been correct, the trial below would have been entirely appropriate. Yet, because plaintiffs never alleged that Chicago's ordinance discriminates against interstate commerce in any way, *Pike* was never activated, and a trial was therefore unnecessary.

The district court also found that Chicago's resale ban violates principles of substantive due process. I can agree that this doctrine has only a limited role to play in the constitutional analysis of state and local regulation and that it certainly is not violated by Chicago's ban on the retail sale of spray paint and large markers. *See ante* at 1129. Yet even so, I do not believe that as an intermediate appellate court we are at liberty to continue to question the very existence of the doctrine. *See id.* at 1129; *see also Saukstelis v. City of Chicago*, 932 F.2d 1171, 1173 & n.* (7th Cir.1991). The Supreme Court has adhered to its substantive due process jurisprudence in a number of recent decisions, and that, to my mind, is the end of the matter. *See, e.g., Reno v. Flores*, —— U.S. ——, ——, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993); *Planned Parenthood v. Casey*, —— U.S. ——, —— – ——, 112 S.Ct. 2791, 2804–07, 120 L.Ed.2d 674 (1992); *Collins v. City of Harker Heights, Texas*, 503 U.S. 115, ——, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992).

Finally, I find it curious that the majority thinks it necessary to assess Chicago's ordinance under the Equal Protection Clause, as my colleagues apparently recognize that no equal protection claim has been advanced in this appeal. *See ante* at 1129. The district court did not invalidate Chicago's ordinance under the Equal Protection Clause, and such a claim thus was not briefed to this court. I would therefore refrain from any comment on the viability of an equal protection claim in this context.

With these qualifications, I concur in the reversal of the district court's judgment.

---

1. Perhaps the court was influenced by the City's apparent concession for purposes of its motion to dismiss that the *Pike* balancing test applied. *See*

*National Paint & Coatings Ass'n v. City of Chicago*, 803 F.Supp. 135, 142 & n. 4 (N.D.Ill.1992).