**MARUSIC LIQUORS, INC., doing business as Cornell Liquors, Plaintiff–Appellant,**

**v.**

**Richard M. DALEY, Mayor of Chicago and Local Liquor Control Commissioner, et al., Defendants–Appellees.**

**No. 94–2903.**

United States Court of Appeals, Seventh Circuit.

Argued April 12, 1995.

Decided May 15, 1995.

Michael A. Moses, Richard G. Schoenstadt, Morton Siegel (argued), James L. Webster, Siegel, Moses, Schoenstadt & Webster, Chicago, IL, for Marusic Liquors.

Lawrence Rosenthal, Deputy Corp. Counsel, Susan R. Lichtenstein, Benna R. Solomon, Susan Haerr Zucker, Julian Henriques (argued), Susan S. Sher, Thomas J. Dombai, Office of Corp. Counsel, Appeals Div., Chicago, IL, for Richard M. Daley, Local Liquor Control Com'n of City of Chicago, Winston L. Mardis and City of Chicago.

Before ALDISERT,[*] EASTERBROOK, and ROVNER, Circuit Judges.

EASTERBROOK, Circuit Judge.

During the last several years the City Council of Chicago has enacted a series of ordinances freezing the number of liquor licenses in particular neighborhoods. Approximately a third of the City now is subject to a moratorium. These ordinances prevent the issuance of new liquor licenses in the affected areas and restrict transfers of existing licenses: licensees may transfer their businesses only on death or to immediate relatives. Non-relatives who own part of the business when a moratorium takes effect may buy the rest; strangers may buy no more than a 5% interest per year. Chi.Muni.Code § 4–60–024.

Tomica Marusic owns 100% of Cornell Liquors, a package goods store. In November 1991 the City Council dubbed "East 53rd Street (South Side) from S. Lake Park Avenue to South Shore Drive" and "East 55th Street (both Sides) from S. Lake Park Avenue to South Shore Drive" as moratorium zones. Chi.Muni.Code § 4–60–020(e)(9), (10). This nine-square-block area includes Marusic's store. Marusic believes that the practice of designating a few city blocks for special treatment violates Illinois law, which requires cities to regulate liquor by "general ordinance." 235 ILCS 5/4–1. Marusic wants to be rid of the restrictions on his sale of the license and store. But instead of filing suit under state law in state court, Marusic filed this federal suit under 42 U.S.C. § 1983, contending that the freeze violates the equal protection and due process clauses, takes his property without just compensation, and amounts to a bill of attainder. The district court dismissed the action on the pleadings, ruling that the claims are unripe because Marusic has no immediate plan to sell the business. 1994 WL 376280, 1994 U.S.Dist. LEXIS 9738.

■ Moratorium ordinances aid incumbent vendors at the expense of consumers. They restrict competition and thus promote higher prices. Marusic appears to be a winner rather than a loser—and his request in this litigation, to avoid the restrictions on sale rather than to avoid the restrictions on the issuance of new licenses, appears to be an effort to capitalize these gains through a higher price for his business. Yet Marusic suffers injury and therefore has standing to sue. The benefits to incumbents are spread over many years. Someone who wants to change occupations or locations in the near future to better his station in life can be a net loser. He will experience higher profits for only a few years, and then under the ordinance he must abandon the business, suffering a capital loss that may swamp the temporary gains. Only licensees who plan to stay put indefinitely are winners. (Marusic insists that his immediate relatives do not want to run the business; perhaps Marusic or his wife could retain ownership while hiring outside management, but the agency costs of this arrangement may be high.) Marusic has standing to sue; the only question is whether now is the right time.

■ A claim is unripe when critical elements are contingent or unknown. When, for example, a property owner alleges that general regulation affects his land in some special way, the claim is not ripe until all efforts to avoid the restriction or obtain compensation for it have been exhausted. *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186–97, 105 S.Ct. 3108, 3116–22, 87 L.Ed.2d 126 (1985). Marusic does not contend that the moratorium has any special effect on his property—and Chicago does not

[*] Hon. Ruggero J. Aldisert, of the Third Circuit, sitting by designation.

afford licensees any way to avoid (or be compensated for) its application. The terms of the law are clear, their application straightforward. That ordinarily makes a dispute ripe for decision. *Yee v. Escondido,* 503 U.S. 519, 533–37, 112 S.Ct. 1522, 1532–33, 118 L.Ed.2d 153 (1992); *Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 580–82, 105 S.Ct. 3325, 3332–33, 87 L.Ed.2d 409 (1985); *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). A claim is ripe when "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson,* 473 U.S. at 186, 105 S.Ct. at 3116. That aptly describes Marusic's circumstances: the ordinance itself embodies a conclusive decision about transferability. True, it is an open question whether, and if so when, Marusic will try to sell the store. Yet the ordinance has immediate effects: knowing that he cannot sell his business, Marusic will invest less in maintaining and expanding it; he will be less willing to train for and seek out other lines of business, because a change of career will impose a large capital loss (he paid $100,000 for the liquor store in 1990); other persons interested in operating a liquor store will do less searching (they will avoid the freeze zones), so Marusic has a lower likelihood of receiving an attractive offer; and of course if buyer and seller should get together in the future, they would have to bear the delay and costs of trying to upset the ordinance before consummating their deal. The law defeats any possibility of selling the business on short notice, an entitlement of value to property owners. These effects are similar to other costs (including opportunity costs) that have led the Supreme Court to deem disputes ripe. E.g., *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 140, 95 S.Ct. 335, 356–57, 42 L.Ed.2d 320 (1974); *Abbott Laboratories, Inc. v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). See also *Triple G Landfills, Inc. v. Board of Commissioners of*

*Fountain County,* 977 F.2d 287 (7th Cir. 1992).

Although the district court should not have dismissed this suit as unripe, neither side wants us to remand for further proceedings. The merits have been exhaustively briefed. The facts are undisputed. A court of appeals should bring litigation to a close when it can, to avoid putting the parties through the wringer and lengthening the queue in which other litigants wait. *Saukstelis v. Chicago,* 932 F.2d 1171, 1174 (7th Cir.1991); *Chicago Observer, Inc. v. Chicago,* 929 F.2d 325, 329 (7th Cir.1991); *Cronin v. Department of Agriculture,* 919 F.2d 439, 445 (7th Cir.1990). This case is readily decided here and now.

■ Not since the *Slaughter–House Cases,* 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873), has it been seriously maintained that the fourteenth amendment curtails the states' power to restrict competition in business—if they choose, by establishing and limiting systems of occupational licensure. The *Slaughter–House Cases,* dispatch any argument that the privileges and immunities clause entitled persons to conduct businesses free of regulation (there, of exclusion, for the state set up a monopoly). *New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), repeats the lesson for the equal protection clause. New Orleans excluded push cart vendors from the Vieux Carre, with an exception for firms that had been doing business for eight years—an exclusion that turned out to create a monopoly. *Dukes* and *Slaughter–House* show that Chicago could have shuttered all recent comers to the liquor business. We have completed the circle by holding that precincts may go "dry," closing all liquor outlets in an area. *Philly's, the Original Philadelphia Cheese Steak, Inc. v. Byrne,* 732 F.2d 87 (7th Cir. 1984). Moratorium ordinances eventually reduce the number of liquor outlets in a neighborhood; Marusic acknowledges that this is a permissible governmental objective, which in light of the twenty-first amendment no one could doubt. *National Paint & Coatings Ass'n v. Chicago,* 45 F.3d 1124 (7th Cir.1995), adds that business regulation satisfying the "rational basis" standard under the equal protection clause also satisfies the due pro-

cess clause of the fourteenth amendment. Instead of closing Marusic's business, the City quit issuing new licenses while grandfathering existing firms. Liquor outlets will diminish by attrition. If the City could shut down liquor businesses entirely, then the "kinder, gentler" regulation accomplished by a freeze plus a grandfather clause must be permissible. That covers the waterfront; Marusic loses.

Marusic depicts his license as a kind of property that the state must respect, and the privileges of which it may not change. This misunderstands the nature of a "license" in a system of regulation.

A license is nothing but a promise by the issuing body not to interfere in business conducted according to its terms. *River Park, [Inc. v. Highland Park,* 23 F.3d 164 (7th Cir.1994) ] at 166; *Toulabi v. United States,* 875 F.2d 122 (7th Cir.1989). Not since legislatures responded to the *Dartmouth College* case by reserving the right to alter the terms of charters and licenses have courts treated them as *substantive* bars to regulation. A license, as a species of property, may require the government to afford appropriate process. But the people, directly or through their legislature, may alter the substantive terms of the promise not to interfere in private economic transactions. See *Philly's, the Original Philadelphia Cheese Steak, Inc. v. Byrne,* 732 F.2d 87 (7th Cir.1984) (holding that Illinois may allow each voting precinct to decide whether to permit the sale of liquor, even though a decision to "go dry" may extinguish rights held under licenses and even though customers may continue to buy liquor in neighboring precincts).

*National Paint,* 45 F.3d at 1129 (emphasis in original). The case we cited, *Philly's,* is especially apropos here. It involves the same business (liquor) and even greater intrusion (closing the business without compensation, as opposed to permitting the business to continue while restricting transfers). States may define the extent to which licenses are transferable: law licenses do not pass by intestate succession, and the Chicago Board of Trade does not make a market in

dental-license futures. Some licenses are freely saleable; others are non-transferable; and a public body may choose, as Chicago did, to strike a middle ground. Cf. *In re Tak Communications, Inc.,* 985 F.2d 916 (7th Cir. 1993) (describing the middle ground for broadcast licenses).

Seeking to turn adversity to advantage, Marusic leans heavily on *Philly's.* We held that precincts may go dry by referendum, a form of direct democracy. Here the City Council has acted. Marusic insists that he was thus deprived of the "protections" offered by a referendum. He could try to persuade his neighbors to vote wet; but how could he influence the City Council, which does not even have to offer him a hearing? This argument deserves credit for inventiveness, but it has things backward. Indirect democracy is the ordinary form of governance in the United States. Assemblies of elected representatives decide. One premise of this method is that the representatives spend more time studying the problems of society than do ordinary voters. Because no single person's vote affects the outcome of a plebiscite, the voters do not invest heavily in information; rational ignorance is the order of the day, and direct elections accordingly are more prone to decision by passion or prejudice—as Socrates learned. Professional legislators not only have more time to brush up on the facts but also more reason to do so, because votes in a smaller assembly are more likely to be dispositive. Of course professional representatives also have more opportunity to court (and be courted by) special interest groups, but this has been accepted as the lesser evil: better an elected representative under the sway of organized interest groups than decision by a mob. The question at issue in *Philly's* was, given that decision by a legislative assembly is possible (and preferred), is decision by referendum *also* permissible? We answered "yes," as had the Supreme Court in *Eastlake v. Forest City Enterprises, Inc.,* 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976), when confronting the question whether the people may make zoning decisions by plebiscite. Justice Stevens had dissented in *Eastlake,* arguing that direct democracy deprives citizens of "due process of lawmaking." *Id.* at 680–94,

96 S.Ct. at 2365–72. The majority rejected that argument without converting direct democracy into a preferred (let alone an obligatory) way of making legislative decisions; so too with *Philly's*, which observed: "to equate due process of law with a particular type of procedure, the adversary hearing modeled on the Anglo–American trial, and thus to create an unbridgeable chasm between democracy and due process, would take too narrow a view of due process." 732 F.2d at 91. Just as the normal legislative process satisfies the due process clause for making class-wide decisions, *Atkins v. Parker*, 472 U.S. 115, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985); *Bi–Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915), so the referendum satisfies the due process clause.

*Philly's* went on to reject an argument that permitting decision precinct by precinct (which can be as small as one apartment building) facilitates discrimination against licensees who are disfavored for improper reasons, such as skin color, religion, speech—or being a recent immigrant. The possibility that prejudice will influence decisions does not forbid any particular method of reaching decisions, we held. 732 F.2d at 92–94. Just so today. Marusic does not want an opportunity to prove that when enacting the moratorium any Alderman was prejudiced against him or had the slightest idea who owned the licenses in the moratorium zone. (It is part of the price a litigant pays for mounting a "facial" challenge, which Marusic had to do to make his claim ripe.) As we pointed out, existing licensees are on average gainers from laws that forbid new entry. If as Marusic alleges his is the only package store in the moratorium zone, that increases his expected benefits from the diminution of competition. Marusic does say that the boundaries of the moratorium zones were selected for "political" reasons, but "politics" is hardly a forbidden ground of decision by a political body. We need not consider whether Marusic would have a better case if the City Council had required the sole liquor outlet in a neighborhood to close its doors; that is not what happened. Marusic seeks to deny to the City Council any power to enact freezes.

That objective is unattainable, so the judgment dismissing the suit is

AFFIRMED.